# RICHARD H. ROSENBERG
## ATTORNEY AT LAW

217 BROADWAY  
SUITE 707  
NEW YORK, NEW YORK 10007

TEL: 212-586-3838  
FAX: 212-962-5037  
richrosenberg@msn.com

June 12, 2023

Hon. Katherine Polk Failla  
United States District Judge  
United States District Court  
Southern District of New York  
40 Foley Square  
New York, NY 10007

                      Re:  United States v. Garnett,  
                            S2 21-Cr-414 (KPF)

Dear Judge Failla:

      Kwame Garnett pled guilty, pursuant to a written plea agreement, to two counts in the operative indictment – Count One (conspiracy to distribute and to possess with intent to distribute cocaine and fentanyl in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846) and Count Four (possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)). He faces a mandatory minimum sentence of 60 months on Count Four, and no mandatory minimum on Count One.

      In this sentencing letter, we offer for the Court's consideration facts and circumstances under 18 U.S.C. § 3553(a) that weigh in favor of a sentence close to the mandatory minimum term of imprisonment. Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Sattar*, 2012 WL 2434760, at *10 (2d Cir. 2012). Thus, we turn first to a discussion of the history and characteristics of Mr. Garnett that support the requested sentence.

1

## HISTORY AND CHARACTERISTICS OF KWAME GARNETT

Mr. Garnett is the fifth of seven children born to Farinda Garnett and Ambrose Wan. Yet, although their union was stable, their ability to care for their children was not. Mr. Wan was not present in the home, and Mr. Garnett did not really know him, although he occasionally provided money for the children's support. Ms. Garnett was a drug user who "didn't have her stuff together."[1] When Mr. Garnett was four years old, ACS removed the children from her care and sent them to live with her mother (Mr. Garnett's grandmother) Benny Garnett ("Mrs. Garnett"), at 1830 Lexington Avenue. The children never returned to their mother's care. They did, however, see her on the streets "in the area" every day.

Thereafter, the children (eight in total) lived in a 3-bedroom apartment with Mrs. Garnett and, sporadically, her husband who "would come and go," leaving the children without a father figure to look up to or emulate. Mrs. Garnett treated the children like they were her own. She worked hard to support them, with a food truck business and by selling Avon products. But even though Mr. Garnett's grandmother did her very best for the children, the hole caused by their mother's absence could not be filed. Mr. Garnett does not have "really any good memories" of his childhood.

Mr. Garnett attended, but did not complete, high school. He got "caught up in the streets," smoking marijuana for the first time at 14 (and thereafter on an intermittent basis), occasionally taking non-prescription Percocet and drinking alcohol as well. And he accumulated a series of arrests and periods of incarceration that he looks back on with regret.

But Mr. Garnett turned each period of incarceration into as positive an experience as he could. He earned a Building Maintenance certificate during a prior term of incarceration and gained some experience in electrical and small engine work. At Westchester County Jail, where he spent nearly 14 months in 2022 and 2023, Mr. Garnett enrolled in GED preparation classes run by Sprain Brook Academy. He earned positive feedback in each relevant program category (regular attendance, class participation, assignment completion, etc.). See Exhibit A. He completed the Resolve to Stop the Violence Project (RSVP) course. See Exhibit B. He worked as much as he was able, both in the kitchen and in the commissary.

In his personal life, too, Mr. Garnett has made positive choices. He is in a stable relationship with Vanessa Almodovar. Ms. Almodovar has written a letter to the Court calling Mr. Garnett "a man of morals and integrity." Exhibit C at p. 1. She describes how he had been on a positive path before his arrest in this case, obtaining medical insurance and seeking medical care and beginning to enroll in GED, therapy, and job readiness programs. *Id.*, at p. 1-2. She supports his "growth and [their] development and learning as a family," and thanks the Court for understanding "how much the family needs him at home, needs him in a better space, needs him receiving adequate healthcare and most of all, needs him to raise our children together." *Id.*, at p. 2.

---

[1] Quotations are taken from Mr. Garnett's words at the Presentence Interview.

While Mr. Garnett was in pretrial detention in this case, Ms. Almodovar gave birth to their son. He will celebrate his first birthday next month. Mr. Garnett hopes to return home before his son is old enough to feel his absence. He looks forward to getting his life back on track and to being the best father he can be.

In this endeavor, Mr. Garnett will benefit from any job training and placement assistance that the Probation Department can offer to him. He readily admits that his involvement in the instant offense stemmed from the combination of an inability to find work after completing a state sentence and his crippling physical illness, which closes many doors to him. He has no desire to break the law and would gladly accept work that he was physically able to perform.

As the Court is aware, Mr. Garnett, at just 31 years old, suffers from debilitating rheumatoid arthritis. For years before his diagnosis (which was officially made only once he reached Westchester County Jail), he suffered from swelling in his joints that caused constant pain and made it impossible for him to walk without crutches. He was often confined to his bed or a wheelchair. Without a diagnosis, he self-medicated with non-prescription Percocet and with marijuana.

Mr. Garnett was relieved to have a diagnosis at last, and to receive regular injections of Humira which helped to reduce the swelling, although not the pain. For pain, he has received Motrin, which does little for him. He describes constant pain in his lower back, his feet, and his hands. At Westchester County Jail, he was prescribed a cane, which helped him to walk on his swollen feet. Now, because Hudson County Correctional Center has decreed that he does not need the cane, he finds it onerous to walk from his cell to the common areas, navigating flights of stairs with difficulty.

Mr. Garnett's hands are becoming deformed from the arthritis. His grip is weak and he cannot grasp or hold things easily. At Westchester, he was recommended for surgery that would remove some of the inflamed tissue and hopefully restore some mobility. He was told that, after the surgery, he would require extensive rehabilitation and physical therapy to restore full movement in his hands. But he was transferred to Hudson before the surgery could be scheduled. Now, as he serves his sentence, Mr. Garnett needs to receive comprehensive treatment in a facility properly equipped to care for him so that he can return to the community in a condition that will enable him to contribute meaningfully to the financial stability of his family and to live up to his own dreams of putting the past behind him.

## OFFENSE CONDUCT AND GUIDELINES CALCULATIONS

Mr. Garnett sold cocaine in East Harlem between 2019 and 2022. He admitted this conduct and stands by his allocution. At the same time, Mr. Garnett possessed a firearm and ammunition next to his drug supply in a locked drawer of a bedside table.

For context, and without minimizing his admission of guilt, Mr. Garnett explains that, after moving to Ms. Almodovar's neighborhood in the Bronx, which he found to be more violent than his own, he felt that he needed protection. To the best of his recollection, he purchased the

3

gun just a week or so before being arrested. But he kept it unloaded. It would have been difficult, if not impossible, for him to actually use the gun, given the condition of his hands.

The parties stipulated that Mr. Garnett would be held responsible for a conspiracy-based quantity of narcotics, namely between 2 and 3.5 kilograms of cocaine, leading to a base offense level of 26. See Plea Agreement at p. 2-3. After a deduction for acceptance of responsibility, and in Criminal History Category V, Mr. Garnett faces a sentencing range of 84 to 105 months of imprisonment on the narcotics count, plus a minimum of 60 months on the gun count. *Id.*, at p. 3-4. The PSR agrees with this calculation. PSR at ¶¶ 41-50.

The Defense stipulated to the calculation. However, again for context and without in any way detracting from Mr. Garnett's admission of guilt, we note that Mr. Garnett's own sales resulted in a much smaller total quantity of narcotics. The discovery contained video, buy reports, and lab reports relating to 39 sales made by Mr. Garnett to an undercover officer. According to those lab reports[2], a total of approximately 150 grams of cocaine and 0.211 grams of fentanyl was obtained from Mr. Garnett during the investigation. A total drug weight of between 100 and 200 grams, according to the 2021 United States Sentencing Guidelines Manual, results in a base offense level of 16. *See* U.S.S.G. § 2D1.1(c)(12). Subtracting two points for acceptance, in CHC V, level 14 equates to an advisory sentencing range of 33-41 months – substantially lower than the range he accepted in the plea agreement.

In addition, it does not minimize Mr. Garnett's acceptance of responsibility to note that neither the quantities requested by the undercover officer nor the frequency with which s/he approached Mr. Garnett rather than any other seller of narcotics in the area was within Mr. Garnett's control. We ask the Court, when considering an appropriate sentence for Mr. Garnett, to evaluate the plea agreement's stipulated Guidelines range, to weigh it against the actual evidence of Mr. Garnett's own sales, and to fashion a sentence that reflects the incongruity between the two.

## A NON-GUIDELINES SENTENCE WOULD SATISFY ALL OF THE GOALS OF SENTENCING

Section 3553(a)(2) directs that a sentence should (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, [and] medical care. 18 U.S.C. § 3553(a)(2).  The Supreme Court's decisions in *Kimbrough v. United States*, 552 U.S. 38 (2007) and *Gall v. United States*, 552 U.S. 38 (2007), make clear that this Court has full authority to consider any evidence it wants in deciding whether or not the guidelines "properly reflect § 3553 considerations[.]" *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007).  Above all, sentencing must be individualized. *Pepper v. United States*, 562 U.S.

---

[2] In conducting this analysis, we have used the total weight provided in each lab report. In some reports it is noted that samples were obtained but neither weighed nor analyzed. In others, a total weight was obtained but only a subset of the packets obtained were analyzed for purity. Inclusion of the un-weighed items would increase the total, albeit not substantially.

476, 487–88 (2011). *See also Williams v. People of State of N.Y.,* 337 U.S. 241, 247 (1949) ("[T]he punishment should fit the offender and not merely the crime.").

In *Dean v. United States*, 581 U.S. 62, 137 S. Ct. 1170, 197 L. Ed. 2d 490 (2017), the Supreme Court instructed that a district court may properly consider the appropriate total sentence to be imposed and adjust the sentence imposed on counts without mandatory minimum terms in order to reach an appropriate incremental punishment. Thus, the *Dean* Court instructed that a court may impose a sentence of just one day on a non-§ 924(c) offense, if the sentencing court believes the mandatory minimum term would provide adequate punishment for all of the offense conduct, as long as the sentences are run consecutively.

We submit that the scenario envisioned in *Dean* is realized here. Without minimizing the serious nature of Mr. Garnett's offense conduct, a sentence close to the mandatory minimum would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

A sentence at or close to the mandatory minimum of 60 months would certainly provide just punishment. For Mr. Garnett, every day that he spends in jail is far more punishing than it would be for an able-bodied person. His pain is not well controlled, and his ability to seek medical attention or to increase his dosage is sharply circumscribed by the facility's protocols and the limited availability of medical staff. He spent most of his pretrial detention at Westchester County Jail, initially without a diagnosis or adequate control of his symptoms. The facility underwent frequent lockdowns that curtailed his ability to seek medical attention, to take classes, to work, and to receive family visits.

In addition, while at Westchester County Jail, Mr. Garnett was affected emotionally when he was directed, without protective gear, to clean a bloody cell where another inmate had attempted suicide. He did not receive mental health counseling for this episode.

Now, at Hudson County Correctional Facility, conditions are different, but not better. Although he has a bottom bunk, the mattress is thin and adds to his discomfort. To reach his bed from the common area, he has to climb a flight of approximately 25 stairs – without his cane --, which he finds hard to navigate. To avoid the stairs, Mr. Garnett often stays in his cell the entire day.

The pre-trial detainees at HCCC are housed in 64-person units, with two floors of 32 detainees per unit. Each unit has one officer to secure the unit. Due to understaffing, officers are forced to work two units, which causes unremitting lockdowns. Detainees are served almost entirely cold meals, only rarely allowed showers or phone calls, and have minimal time when they are released from their cells into the common area.

For the last two months, since his transfer to HCCC, Mr. Garnett has experienced the lockdowns (from 8:45 am to 3:30 pm every day), and even worse, the delays in medical attention caused by the staffing shortages. For example, on May 23, after making multiple requests, he received an X-ray to diagnose his persistent shoulder pain, which was making it hard for him to raise his arm sufficiently to put on his shirt. Nearly a week later, on May 30, he had still not been

given the results, or any treatment to address the shoulder pain. Now he has developed a concerning lump on his collarbone. He is awaiting medical evaluation, but it clear that he will continue to need comprehensive medical care and that he will continue to suffer as it is delayed.

Courts have long recognized the stressful conditions at HCCC and have imposed shorter sentences as a result of the harsh time spent in pretrial detention there. *See*, *e.g.*, *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (granting a downward departure where defendant spent 13 months at HCCC and in constant fear of gangs, noting, "The evidence supports a finding that the thirteen and a half months that Defendant served at HCCC were under qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons. This Court finds, therefore, that a downward departure is warranted.").

In addition, courts around the country have imposed sentences well below the advisory Guidelines in several cases where a defendant suffers from serious health conditions and is in need of treatment that the Bureau of Prisons is unable to provide. For example, in *United States v. Scholar*, 252 F.Supp.3d 711, 714 (WI E.D. 2017), the defendant had prior drug convictions and was involved in drug trafficking as part of a racketeering enterprise. Despite advisory Guidelines of 87-108 months, the court imposed a sentence of time served, three years supervised release and one-year home confinement based in part upon the seriousness of defendant's health conditions.

In *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010), the Court granted a downward variance so that the defendant could continue to receive uninterrupted medical treatment outside of prison. On appeal, the Ninth Circuit affirmed the probationary sentence for bankruptcy fraud and making false statements—notwithstanding the 27-33-month Guidelines—for a 63-year-old defendant with a prior criminal record. The court reasoned that while the BOP was capable of providing Edwards' medical care, a sentence of probation would satisfy the requirement of providing needed care in the most effective manner. 18 U.S.C. § 3553(a)(2)(D).

In *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008), the Eighth Circuit affirmed a probationary sentence for a defendant who pled guilty to conspiracy to distribute 102 grams of cocaine based in part upon serious health issues. *See also United States v. Baron*, 914 F. Supp. 660 (D. Mass. 1995) (pre-*Booker*, defendant convicted of bank fraud with Guidelines of 27-33 months was sentenced to one year probation, with six months to be served on home detention, since incarceration would risk rapid deterioration of defendant's interrelated medical conditions); *United States v. Willis*, 322 F.Supp.2d 76 (D. Mass 2004) (pre-*Booker*, defendant pled guilty to failing to report income derived from his illegal gambling business and failing to file tax returns, the court departed from level 17 to level 10, in order to impose a sentence of probation, where it found that the 69-year-old defendant suffered from numerous medical conditions).

Mr. Garnett is not eligible for a non-jail sentence by the terms of his plea agreement. But, in consideration of the physical challenges that he faces each day, and the additional punishment that comes from being unable to freely seek out a second medical opinion, change a course of treatment, or improve the comfort of his surroundings, we ask the Court to impose a sentence

close to the mandatory minimum of 60 months. No greater term of imprisonment is warranted to provide just punishment.

In making this request, we note that the United States Sentencing Commission's Interactive Data Analyzer instructs that, during the past five years in this Circuit, for defendants in CHC V sentenced primarily under USSG § 2D1.1 for cocaine offenses, the average sentence was 74 months, but fully 40% of offenders sentenced received a sentence of less than 60 months of imprisonment.[3]

Deterrence, both general and specific, and protection of the public would also be satisfied through a 60-month sentence. The general deterrent effect of the certainty of punishment is far more consistent than that of the severity of punishment. In fact, "[a]n avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world." *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) (extensively discussing criminological studies concluding that the link between harsh punishment and deterrence of criminal conduct is weak). *See also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) (concluding that "certainty and promptness of punishment are more powerful deterrents than severity. . . . Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

There is a general census that the extraordinary growth over the last two decades in the use of incarceration as a sanction for criminal conduct has failed to serve as a general deterrent. *See*, *e.g.*, The Sentencing Project, *Incarceration and Crime: A Complex Relationship* (2005) (available at: https://static.prisonpolicy.org/scans/sp/inc_crime.pdf). To the contrary, there is little evidence that long prison sentences have a sufficient general deterrent effect to "justify their social and economic costs." Daniel Nagin, "Deterrence in the 21st Century, Crime and Justice in America: 1975-2005," at 201 (ed. Michael Tonry, University of Chicago Press, 2013). A lengthy prison sentence cannot, therefore, be justified on the basis of general deterrence.

Nor can specific deterrence or the need to protect the public justify a lengthy term of incarceration here. Mr. Garnett's offense conduct stemmed more from a need to put food on his table than on a desire to break the law. With a prior felony conviction, a limited education, and a debilitating illness, there were not many available avenues for gainful employment that he could find. In addition, as the PSR notes, Mr. Garnett was raised in a neighborhood where drug dealing is pervasive and may have seemed like a reasonable way to put food on the table, even if it was against the law. Sending Mr. Garnett to jail for a longer period will not change these background facts or solve the problem of how an individual with serious medical issues and without a high school diploma or work history can find gainful employment at an adequate wage.

---

[3] See https://ida.ussc.gov/analytics/saw.dll?Dashboard (select "Sentencing Outcomes," then "Sentence Length," and use the menus on the left side to filter for years between 2017 and 2022, 2nd Circuit, Primary Guideline § 2D1.1, Drug Type Powder Cocaine, and Criminal History Category V)

Rather, what Mr. Garnett needs is comprehensive medical care, a facility that can provide some training in jobs for which he might be suited, and, upon release, assistance of the Probation Department with job placement. These services, more than anything, will deter him from committing another crime by giving him hope for the future and a meaningful way to make a living.

Finally, a sentence at or close to 60 months would be sufficient to provide Mr. Garnett with needed medical care including surgery for his hands and rehabilitation, to give him an opportunity to enroll in job training and educational programming, and to send him back to his community sufficiently physically rehabilitated that he will be able to work and provide for his son.

While the Defense appreciates the Probation Department's recommendation of a variance below the applicable Guidelines range, we suggest that even a sentence of 102 months would be greater than necessary to do justice in this case. Mr. Garnett has been incarcerated since his arrest on February 24, 2022. In that time, his beloved grandmother died of stomach cancer, and he was unable to attend her funeral in person. Now, his mother has been diagnosed with the same disease. He missed the birth of his son, and will miss his first birthday next month. His family needs Mr. Garnett at home. As Ms. Almodovar writes:

> Studies have consistently found that parolees/prisoners who maintain close contact with their family have better release outcomes and lower recidivism rates. Research proves there is a positive relationship that exists between parole success and strong family support. . . .
>
> As his partner, friend, lover and most important his closest moral support I am asking hoping that he is permitted to return home with me and our family. Kwame and I have been together for the past six years and he has become a mature and abiding individual. I am very supportive of Kwame's growth and our development and learning as a family. I know he will continue to be a good and ethical person. Thank you for understanding how much the family needs him at home, needs him in a better space, needs him receiving adequate healthcare and most of all, needs him to raise our children together.

Exhibit C at p. 2.

Through educational programming and jobs at Westchester County Jail, Mr. Garnett has demonstrated to the Court that he is working toward a law-abiding future and that his rehabilitation has begun. With medical treatment and additional programming opportunities once he is finally transferred to Bureau of Prisons custody, he will be able to continue on this path and to return home to Ms. Almodovar in a position to contribute to the family as they raise the children together.

## CONCLUSION

For all of these reasons, we ask the Court to impose a sentence at or close to the mandatory minimum of 60 months in prison, which would be "sufficient, but not greater than necessary" to serve the sentencing goals of 18 U.S.C. § 3553(a).

We respectfully ask that the Court recommend a facility as near to the New York metropolitan area as possible to facilitate family visits.

We thank the Court for its consideration of this submission.

Respectfully submitted,

_____/s/_____
Richard H. Rosenberg, Esq.

_____/s/_____
Clara Kalhous, Esq.

Cc:   All counsel (by ECF)
      US Probation Officer Simone Belgrave (by email)
      Mr. Kwame Garnett (by hand)